38026. BRANTLEY v. THOMPSON.
38027. BRANTLEY v. HURST *et al.*

Decided September 12, 1960.

*Hodges & Lott, Ben A. Hodges, Arthur B. Lott, Jr.,* for plaintiff in error.

*Garrett & McDonald, Frank B. McDonald, Jr.,* contra.

Carlisle, Judge. Mrs. Mollie Brantley made application to the processioners of Ware County to have the lines around her tract of land surveyed and marked anew. Pursuant to notice, the processioners met with the county surveyor and proceeded to survey and mark anew the lines around the applicant's property. Mrs. Nezzie Thompson, the owner of a tract of land adjoining that of the applicant on the southeast, and Mr. and Mrs. L. T. Hurst, owners of a tract adjoining on the south, filed protests to the return of the processioners. The case came on for trial in the Superior Court of Ware County before a jury, and at the conclusion of the evidence after the applicant had moved for a directed verdict, the jury returned a verdict in favor of the protestants. The applicant made a motion for a judgment notwithstanding the verdict and in the alternative for a new trial on the general grounds and on six special grounds. The trial court overruled those motions and the exception here is to that judgment.

On the original appearance of these cases, this court dismissed the writs of error on the ground that the bills of exception had not been tendered to the trial judge within the time provided by law. 101 Ga. App. 257 (114 S. E. 2d 60). The Supreme Court granted certiorari and reversed that judgment (216 Ga. 164, 115 S. E. 2d 533), and this court now has before it for consideration the merits of the case as presented by the motion for a judgment notwithstanding the verdict and the motion for a new trial.

The evidence showed that the applicant's land around which she sought to have the lines surveyed and marked anew lies roughly in the shape of a truncated right triangle with the legs thereof constituting the western and the northern boundaries of the tract and the hypotenuse forming the southeastern boundary of the tract, but with a very short side on the south described in the deeds as being ten yards in length along the run of Mill Branch. The western boundary line coincides with the land lot line between land lots 139 and 140. The lands to the west and north of the applicant are held by D. B. Bennett. Mrs. Thompson, one of the protestants, owns the lands adjoining the southeastern side, and the protestants Hursts' land lies to the south thereof, the common boundary between their land and the applicant's being the run of Mill Branch. The gist of the protestants' contentions with respect to the location of the lines around the applicant's land is that the location of the west line thereof as surveyed by the county surveyor and the processioners is some 31 or 32 feet to the east of what they contend is the true land lot line between lots 139 and 140. The surveyor located the northwest corner of the applicant's land at an old pine stump. Thirty-one feet to the west thereof there was, at the time the processioning proceeding was had, a railroad rail driven, or set, in the ground vertically. It is contended that this railroad rail marks the northwest corner of the applicant's land and the location of the land lot line at that point. In order to support this contention, the protestants employed another surveyor to run the original land lot lines between lots 139 and 140 and between lots 183 and 184, which lie immediately to the south thereof. The surveyor thus employed set up at what was contended by protestants to be the common corner between lots 183, 184, 185 and 186, which corner was one lot's width or depth to the south of lots 139 and 140. Thus set up he ran a line, according to his testimony, and according to the plat prepared by him on a bearing of north, one degree west, to a point lying on the original east-west lot line dividing lots 139 and 140 from lots 183 and 184, and lying 32.3 feet to the west of a pine corner used by the county surveyor and the processioners as a starting point. The surveyor continued this line

on the same bearing and came out at the railroad rail. The line thus run, it will be seen, is almost parallel and between 31 and 32 feet to the west of the line marked by the processioners. The protestants contend that the line run by their surveyor is the true original line between lots 139 and 140, and that in marking off the other boundaries of the applicant's tract it should be used as a base line for the measurement of the distances of the adjacent sides. It will thus be seen that if the contentions of the protestants are sustained and if the courses and distances called for by the applicant's deed are followed, the entire tract of the applicant as surveyed and marked by the county surveyor and the processioners would be shifted westwardly some 31 or 32 feet.

The county surveyor testified that there was some discussion when he and the processioners met as to where the survey should be started, but that all finally agreed that he could use as a starting point the intersection of two fences which was agreed to be the common corner of lots 183 and 184 on the south and 139 and 140 on the north; that he surveyed the line north on a bearing of one degree west and found quite a few fences along the line running in a northerly direction; that these fences had been there for some time; that they were old fences with one exception; that they were approximately on the line that he ran; that they would drift over from one side to the other; that after he ran out of the fences he came to Mill Branch where he found one 8-inch gum within four feet of his line with some side blazes on it; that this was the only mark that he found in Mill Branch; that he ran the line on north on the same heading and crossed a public road, and after crossing that road he hit an old fence with an old hedgerow; that he had to offset that fence and hedgerow, that is, move his instrument over a few feet and run a parallel line, and that when he came back from the offset line to the real line he was at a 12-inch pine stump shown on his plat as representing the northwest corner of the applicant's land; that on the eastern side of the fence was a cultivated field; that from the stump he ran the line in an easterly direction along another old fence next to the same cultivated field, past the corner of this fence and continued on out through

the woods to a point 1,200 feet from the stump where he hit an iron pipe driven into the ground, passing a 14-inch cypress with "old chops" on it which was directly on his line; that from the pipe he ran the line in a southwestwardly direction, at first running through woods for about 581 feet, hitting a corner fence post with a fence and a hedgerow which required him to offset his instrument and run a parallel line along the old fence back down to the public road previously crossed; that the fence runs along the line for 750½ feet; that from the public road he ran the line down to an 18-inch cypress along the bank of Mill Branch with old chops on it, which the processioners felt should be recognized; that he ran the line from there along the run of Mill Branch 51 feet to the line that he had run earlier coming up from the lot corner; that he observed the condition of the fields on both sides of the fence between Mrs. Brantley and Mrs. Thompson and they appeared to have been in cultivation for a long time; that the fence had been there for a long time, and that it was an old fence. He further testified that the lines which he ran with the processioners were old lines, that he found indications on the ground, old fences, old chops on the trees, landmarks, and evidence that the line had been in existence.

The county surveyor's testimony was substantiated, and elaborated on in many particulars by the testimony of the processioners. With regard to the fence found along the southeast line of the applicant, all of the processioners testified that it was an old fence, that it had been there for 40 or 50 years, judging by the way hardwood growth stood in the hedgerow around the fence. The applicant testified that she and her husband had been in possession of the property in question since December of 1924, and that their field had been in cultivation up to the fence between her land and Mrs. Thompson's, and that Mrs. Thompson's field except for a rough place at one point, had been in cultivation on her side up to the fence ever since she and her husband had been in possession of the land.

The protestant, L. T. Hurst, made no contention on the trial of the case that the location of his line where his property joined that of the applicant was anything other than in the run of Mill Branch where the processioners located it. With re-

spect to his protest, his testimony unequivocally shows that he has no dispute with the applicant as to the location of the line between his land and the applicant's land as surveyed and marked by the processioners. Under this view of the evidence, not only was the verdict for him and Mrs. Hurst, as protestants, unauthorized, but a contrary verdict was demanded by the evidence. It follows that the trial court erred in denying to the applicant a judgment notwithstanding the verdict for the protestants Hurst.

Hurst, as a witness in the case, testified that the land lot line between lots 139 and 140 had not been marked by a line of fences or other marks so far as he knew so as to locate it, as contended by the protestants.

Tavell Courson, the surveyor employed by the protestants to run the land lot line between lots 139 and 140, testified that he dropped back to what he assumed to be a corner between lots 183, 184, 185 and 186, one lot's width south of lot 139. He admitted, however, on cross-examination that there was no physical evidence on the ground to show where the lot corner he assumed was located; that no one told him or pointed it out as being a lot corner; that from that assumed corner all he sought to do was to run a straight line as representing the original land lot line, and that he ran north, one degree west; that he found no marks on the line he ran between lots 139 and 140, all the way from the railroad iron to the swamp of Mill Branch where he did find a lot of blazes "right there in the creek," but he couldn't determine if they were the correct line or not, and he answered the following question, put to him on cross-examination, in the affirmative: "Just to summarize then, you testify that you found three markers; one of them is two feet from the line you say is incorrect and 17 feet from the line you say is correct. The other two are side blazes. All of these are down below lot 139."

No survey was made by the protestant's surveyor of the line between Mrs. Brantley and Mrs. Thompson, and the only testimony as to a physical mark on the ground showing the location of this line to be other than as marked by the processioners was that there was a ditch on the west side of the fence which ran at a slight angle from the fence starting about ten feet from the

fence on the west side thereof and angling down to a point about 25 feet from the fence, according to one witness, and it was contended that this ditch was on the line. However, all of the protestants' witnesses admitted and testified that both the Brantleys and Mrs. Thompson had been in possession of the land up to the fence, and, except for the rough area through which this ditch ran, the land had been cultivated by the respective owners up to the fence for many years. The testimony as to the location of the ditch within ten to twenty-five feet of the fence would not sustain or authorize a verdict finding the line to be 32 feet to the west of the fence, as contended by the protestants.

"In all cases of disputed lines the following rules shall be respected and followed: Natural landmarks, being less liable to change, and not capable of counterfeit, shall be the most conclusive evidence; ancient or genuine landmarks, such as corner station or marked trees, shall control the course and distances called for by the survey. If the corners are established, and the lines not marked, a straight line, as required by the plat, shall be run, but an established marked line, though crooked, shall not be overruled; courses and distances shall be resorted to in the absence of higher evidence." *Code* § 85-1601. With respect to the line between Mrs. Brantley and Mrs. Thompson, the evidence shows, without dispute, that the processioners and county surveyor followed the mandate of this Code section to the letter in running that line. Even conceding for the sake of argument that the proper location of the applicant's northwest corner is at the iron rail driven or set in the ground as shown by the testimony, her deed describes the northern boundary of her tract as a line running eastwardly from this corner a distance of 1,200 feet, which is the line marked by the processioners by measuring 1,200 feet from the stump. Since the witnesses all testified that this line ran to an iron pipe driven in the ground and assumed as the northeast corner of the applicant's lands, the processioners were authorized, if not required, to recognize that pipe as a corner, and even had the line been run from the *rail* eastwardly, that pipe would have controlled as a corner even though it had resulted in a line 1,231 feet long, since under the provision of the Code section quoted such landmarks control

the courses and distances called for. From that corner the processioners, with the surveyor, ran a straight line southwestwardly to the fence corner and then followed the fence for its entire length down to the public road, and from the end of the fence another straight line on a slightly different course was run to a marked corner tree in Mill Branch. The running of a straight line from the northeast corner station to the fence corner and from the southern end of the fence to the corner in the branch where the line was not marked and there was no evidence of possession, was likewise in accordance with the mandate of the Code section. The evidence showing that the applicant and the protestant Thompson had been in possession of their respective lands up to the fence for many years, the processioners were required to mark the line along the fence. *Henderson v. Walker,* 157 Ga. 856 (122 S. E. 613); *Smith v. Brinson,* 43 Ga. App. 248 (158 S. E. 454). Acquiescence in that line for seven years established the line at the fence. *Farr v. Woolfolk,* 118 Ga. 277, 279 (45 S. E. 230); *Sapp v. Odom,* 165 Ga. 437(6) (141 S. E. 201). Acquiescence in such a line for more than seven years is conclusive evidence of an agreement between coterminous landowners as to the location of the line. *Farr v. Woolfolk,* supra.

Under the foregoing authorities, the evidence demanded a verdict in favor of the line surveyed and marked by the processioners, and the trial court erred in denying to the applicant a judgment notwithstanding the verdict as respects the protests of Mrs. Thompson.

The judgment rendered by this court finally terminates the case and it is unnecessary to consider any of the special assignments of error respecting the charge of the court since the case cannot be tried again.

*Judgments reversed. Gardner, P. J., Townsend and Frankum, JJ., concur.*